# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2005   Decided June 2, 2006

No. 02-3067

UNITED STATES OF AMERICA,
APPELLEE

v.

RAFAEL MEJIA, *A/K/A* JOSE ALVAREZ-RIOS,
*A/K/A* PATRON,
*A/K/A* PROFESSOR,
*A/K/A* GORDO,
*A/K/A* MEMO,
*A/K/A* JUAN GUILLERMO GOMEZ-RAMIREZ,
*A/K/A* JOSE GUILLERMO GOMEZ-RAMIREZ,
APPELLANT

———

Consolidated with
03-3004

———

Appeals from the United States District Court
for the District of Columbia
(No. 99cr00389-01)
(No. 99cr00389-02)

———

*H. Heather Shaner*, appointed by the court, argued the cause
for appellant Rafael Mejia.

*Jon S. Pascale*, appointed by the court, argued the cause for appellant Homes Valencia Rios. *Joseph Virgilio*, appointed by the court, was on the brief for appellants.

*Teresa A. Wallbaum*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Robert A. Feitel*, Attorney.

Before: TATEL and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.[1]

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Following a jury trial, defendants Rafael Mejia and Homes Valencia Rios were convicted of conspiring to distribute cocaine with the knowledge and intent that it would be unlawfully imported into the United States. Mejia was sentenced to 400 months in prison and Rios to 324 months. The defendants raise a number of jurisdictional, procedural, evidentiary, and constitutional challenges to their convictions and sentences. We consider those challenges below.

I

From June through November 1998, Costa Rican law enforcement officers conducted an investigation of a drug trafficking organization in Costa Rica. The investigation involved multiple wiretaps, which captured Colombian nationals Mejia and Rios discussing large drug transactions with other members of their drug trafficking organization. Based on information from these wiretaps, law enforcement officials intercepted three shipments of drugs in October 1998. On

---

[1]Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

October 3, Costa Rican police seized 200 kilograms of cocaine from a truck at the border of Nicaragua and Costa Rica. On October 14, Nicaraguan police seized 130 kilograms of cocaine from a truck at the border of Nicaragua and Honduras. And on October 18, Costa Rican police seized 25 kilograms of cocaine from a truck in Costa Rica.

On November 30, 1999, a federal grand jury in the District of Columbia named Mejia and Rios in a one-count indictment that charged them with conspiring to distribute five or more kilograms of cocaine with the knowledge and intent that such cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963.[2] The indictment alleged a conspiracy beginning no later than June 1998 and lasting until at least November 1998, spanning the countries of Columbia, Panama, Costa Rica, Guatemala, and Nicaragua. A magistrate judge in the District of Columbia issued warrants for the arrests of Mejia and Rios, and copies of the warrants were provided to Panamanian law enforcement officials.

On February 9, 2000, Panamanian authorities seized Mejia and Rios in Panama. Hours later, the Panamanians transferred the two men into the custody of United States Drug Enforcement Agency (DEA) agents at Tocumen International Airport in Panama City. DEA Special Agents Michael Chavarria and Joseph Evans then arrested Mejia and Rios and transported them

---

[2]Section 959(c) further provides: "This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia." 21 U.S.C. § 959(c).

to the United States. En route, the DEA agents advised the men of the charges against them and read them their *Miranda* rights in Spanish.

Upon arrival in Fort Lauderdale, Florida, the DEA agents processed Mejia and Rios through Customs and Immigration, again advised them of their rights, and separated them for questioning. Mejia orally waived his rights and made statements inculpating himself in the transportation of drugs to the United States. Rios also waived his rights and signed a written statement inculpating himself in drug trafficking in Central America. Following these interviews, the DEA flew Mejia and Rios to Washington, D.C., where they were incarcerated pending trial.

On May 25, 2000, while the defendants awaited trial, the grand jury issued a superseding indictment enlarging the time period of the alleged conspiracy. Whereas the original indictment charged a conspiracy spanning six months in 1998, the superseding indictment stated that the conspiracy began no later than November 1995 and continued until February 2000. In all other respects, the superseding indictment was the same as the original.

During the pretrial period, the government provided discovery materials to the defense. These materials included DEA-6 forms summarizing the DEA's interviews with cooperating witnesses, which the government produced at least four months prior to trial. When the forms were originally provided, the names of the witnesses, as well as other identifying information, were blacked out. The redacted DEA-6 forms describe multiple drug transactions between 1995 and 2000 involving the cooperating witnesses and appellant Mejia. After receiving these statements, the defense moved pursuant to Federal Rule of Evidence 404(b) to prevent the cooperating

witnesses from testifying, arguing that their statements detailed bad acts by Mejia that were unrelated to the October 1998 seizures and therefore assertedly irrelevant to the conspiracy outlined by the government. The court denied the motion. Approximately two weeks before trial, the government turned over unredacted versions of the DEA-6 forms, thereby revealing the identities of its cooperating witnesses, Jorge Alexis Gallardo Funez and Jose Sanchez.

The trial commenced on October 9, 2001. At trial, Funez testified that he was involved in cocaine trafficking with Mejia, and that Mejia told him that the drugs were destined for the United States. Funez related that, in 1996, he assisted Mejia in transporting 700 kilos of cocaine, 100 of which Mejia intended to ship to Los Angeles. Sanchez testified that he was also involved with Mejia's organization, primarily in overseeing financial matters. Sanchez stated that, in 1996, at Mejia's request, he went to Houston at least three times to assist in counting and transferring money. Sanchez also testified that, in 1997, Mejia told him that a 1,400 kilogram shipment was going to "California, to Houston, Texas, and to the towers in New York." Trial Tr., vol. XIII-A at 31 (Nov. 1, 2001). Neither Funez nor Sanchez offered any testimony about Rios.

In addition to the testimony of the cooperating witnesses, the government played 26 tapes of conversations recorded during the Costa Rican wiretapping investigation. Eight of those conversations were between Mejia and other members of the drug trafficking conspiracy. Nine of the telephone calls were between Rios and other members of the conspiracy. Several witnesses identified the defendants' voices on the tapes. Inspector Siegfredo Sanchez,[3] who led the Costa Rican

---

[3]Because Inspector Sanchez shares the same surname as the government's cooperating witness, Jose Sanchez, we will refer to the

investigation, identified Mejia's voice on eight of the tapes; DEA Agent Evans identified Mejia on three of the tapes; and Juan Delgado, a prisoner who met Mejia and Rios during their pretrial incarceration, identified Mejia on four of the tapes.[4] Both Inspector Sanchez and DEA Agent Chavarria identified Rios' voice on eight tapes; Delgado identified Rios on seven tapes.

According to the prosecution, the conversations captured on the tapes were coded to disguise their subject matter. The government offered Inspector Sanchez as an expert in deciphering the coded language used by drug trafficking organizations, and he testified about the meaning of numerous conversations. For example, Inspector Sanchez decoded a conversation involving a 147-kilogram shipment of cocaine. He testified that, during the conversation, Rios authorized another member of the conspiracy to keep three kilograms of the 147-kilogram shipment as payment for his services. According to Inspector Sanchez, Mejia raised questions about the three-kilogram discrepancy in this shipment during a subsequent taped conversation with another associate, Johnny Morales Cooper.

Inspector Sanchez further testified that coded phrases in the recorded conversations established a nexus with the October 1998 drug seizures. In a conversation on October 2, 1998, two of the defendants' co-conspirators made reference to $200, which Inspector Sanchez testified actually referred to 200

former as "Inspector Sanchez" and to the latter simply as "Sanchez."

[4]Delgado also testified that Mejia told him that he (Mejia) had transported cocaine in Central America, which others would then take to the United States.

kilograms of cocaine.  The next day, October 3, the Costa Rican police seized 200 kilograms of cocaine from a truck at the Nicaraguan-Costa Rican border.  In an October 12, 1998 conversation, two of the defendants' co-conspirators referred to the number 130.  Two days later, on October 14, Costa Rican police seized 130 kilograms of cocaine at the Nicaraguan-Honduran border.

The government also introduced the testimony of former DEA Agent Michael Garland, who testified as an expert on "drug trafficking organizations in Central and South America, . . . shipment routes in South, Central America and North America, the methods and means of communication among drug traffickers in that region, the relative pricing of cocaine in 1998 in Central America, South America, and the United States, and drug logos associated with the packaging of cocaine." Trial Tr., vol. I-B at 57-58 (Oct. 16, 2001).  Garland testified that the principal market for drugs produced in Central and South America is the United States, and that the considerations relevant to determining the destination of Central or South American cocaine were the amount of cocaine, the markings on the cocaine, and the method of concealment.

Finally, DEA Agents Chavarria and Evans testified regarding the defendants' post-arrest statements.  Chavarria testified that Rios admitted to participating with other of Mejia's co-conspirators in smuggling more than 100 kilograms of cocaine from Panama into Costa Rica during 1998, but did not admit knowing that the drugs were destined for the United States.  Evans testified that he asked Mejia about a problem regarding a drug transaction between Mejia and an individual known as "El Negro."  Mejia told Evans that the problem involved a 127-kilogram cocaine shipment that had been seized in Guatemala in 1999.  Mejia said El Negro had held him accountable for the seized cocaine, and further affirmed that El

Negro "was involved in the organization in moving shipments of cocaine to the United States." Trial Tr., vol. IX-A at 57-58 (Oct. 26, 2001). Evans also asked Mejia about the conversation with Johnny Morales Cooper recorded by the Costa Rican authorities regarding the 147-kilogram shipment of cocaine. Mejia explained that there had been a dispute about who had authorized the sale of three kilograms to finance the shipment.

Following the close of the prosecution's case, the defense moved for judgment of acquittal, which the district court denied. On November 14, 2001, the jury found both defendants guilty. The court sentenced Mejia to 400 months in prison on July 10, 2002, and sentenced Rios to 324 months on December 4, 2002.

At Mejia's sentencing, the court found the following drug quantities attributable to Mejia as relevant conduct for purposes of the United States Sentencing Guidelines:

> First, the 700 kilograms of cocaine that Mr. Mejia and Mr. Gallardo Funez shipped from Guatemala to Mexico in 1996[,] of which one hundred kilograms Mr. Mejia would have shipped on his own to the United States. Secondly, the 1,400 kilograms Mr. Mejia received and told Mr. Sanchez was destined for United States cities, in or about 1997. Third, the 147 kilograms transshipped from Costa Rica . . . in August 1997. . . . Lastly . . . a 127-kilogram cocaine amount that Mr. Mejia told Special Agent Evans . . . was destined for the United States but got seized in May of 1999.

Sentencing Hr'g Tr. 46-47 (July 10, 2002). The court noted, however, that it was going to "specifically disregard the 355 kilograms seized [during the three Costa Rican operations in October 1998] for these purposes as the government sentencing

memorandum was wholly inadequate in establishing attribution of these amounts." *Id*. at 47. In denying the government's subsequent request for reconsideration, the court stated that it was "unnecessary to deal with the 355, given how it was not dealt with to [the court's] satisfaction in the [government's sentencing] memo," and that it would not "make a difference with respect to the ultimate adjustment of offense level." *Id*. at 59.

At Rios' sentencing, the court found the following drug quantities attributable to Rios as relevant conduct: the 200-kilogram cocaine shipment seized on October 3, 1998; the 130-kilogram shipment seized on October 14, 1998; and the 147-kilogram shipment that was discussed during the taped conversations but never seized. The court said that, for purposes of sentencing, it would make no findings regarding the 25 kilogram shipment seized on October 17, 1998, since the amount would have "no impact on the guidelines calculation" and "no impact in [the court's] selection of a sentence within the ultimate guidelines range." Sentencing Hr'g Tr. 10 (Dec. 4, 2002).

Mejia and Rios filed timely appeals that challenge many of the district court's pretrial, trial, and post-trial rulings. We consider those challenges below, as well as an issue regarding classified information that arose during the course of this appeal.

II

In this Part, we address the defendants' joint objections to pretrial rulings regarding jurisdiction, discovery, and a bill of particulars. We also address Rios' individual claim that his trial should have been severed from Mejia's trial.

10

A

We begin with the defendants' jurisdictional attack, which we review de novo.  *See United States v. Burke*, 425 F.3d 400, 407 (7th Cir. 2005).  That attack is two-pronged.

First, the defendants charge that the district court lacked jurisdiction over their case because DEA agents took them into custody in Panama and transferred them to the United States without following the formal requirements of the extradition treaty between the two countries.  This claim is governed by the Supreme Court's opinion in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), in which the Court considered a similar argument by a defendant who had been forcibly abducted from Mexico, flown by private plane to Texas, and then arrested by DEA agents.[5]  The Supreme Court set forth the appropriate analytical framework as follows:

> [O]ur first inquiry must be whether the abduction of respondent from Mexico violated the Extradition Treaty between the United States and Mexico.  If we conclude that the Treaty does not prohibit respondent's abduction, the rule in *Ker* applies, and the court need not inquire as to how respondent came before it.

*Id*. at 662.  The "rule in *Ker*" referred to in the above quotation comes from *Ker v. Illinois*, 119 U.S. 436 (1886), was applied in *Frisbie v. Collins*, 342 U.S. 519 (1952), and was confirmed in *Alvarez-Machain*.  Under that rule:

---

[5]The *Alvarez-Machain* trial court concluded that the agents were responsible for the defendant's abduction, although they were not personally involved in it.  *See Alvarez-Machain*, 504 U.S. at 657.

> "[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction' . . . . [D]ue process of law is satisfied when one present in court is convicted of crime after . . . a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."

*Alvarez-Machain*, 504 U.S. at 661-62 (quoting *Frisbie*, 342 U.S. at 522 (quoting *Ker*, 119 U.S. at 444)).

In *Alvarez-Machain*, the Court went on to find that the extradition treaty "sa[id] nothing about the obligations of the United States and Mexico to refrain from forcible abductions of people from the territory of the other nation, or the consequences under the Treaty if such an abduction occurs." *Alvarez-Machain*, 504 U.S. at 663. Nor could the Court "infer from th[e] Treaty and its terms that it prohibit[ed] all means of gaining the presence of an individual outside of its terms." *Id.* at 668-69. Accordingly, the Court concluded that "respondent's abduction was not in violation of the Extradition Treaty between the United States and Mexico[;] the rule of *Ker v. Illinois* [was] fully applicable to th[e] case[; and] the fact of respondent's forcible abduction [did] not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States." *Id.* at 670.

Mejia and Rios do not cite any provision of the United States' extradition treaty with Panama that would warrant a different result here. Like the U.S.-Mexico treaty, the U.S.-Panama treaty contains no prohibition against procuring the presence of an individual outside the terms of the treaty -- let

alone one barring the signatories from informally cooperating with each other as they did in this case. *Compare* Treaty Providing for the Extradition of Criminals, U.S.-Panama, May 25, 1904, 34 Stat. 2851, *with* Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059. In the absence of any suggestion of a ground upon which the U.S.-Mexico and U.S.-Panama treaties can be distinguished, *Alvarez-Machain* controls, and the district court was correct in concluding that it had jurisdiction to try this case.

Second, the defendants argue that the district court lacked jurisdiction over them because the DEA took them into custody in violation of the Mansfield Amendment, which states: "No officer or employee of the United States may *directly effect* an arrest in any foreign country *as part of any foreign police action* with respect to narcotics control efforts, notwithstanding any other provision of law." 22 U.S.C. § 2291(c)(1) (emphasis added). By its terms, the Mansfield Amendment is not applicable here. At the suppression hearing, DEA agent Evans testified without contradiction that Panamanian authorities had arrested the defendants long before the DEA arrived. After hearing the testimony, the district court found that the Panamanian authorities conducted the "direct police action during which the defendants made a transition from liberty to custody," and that this direct police action "occurred many hours before the DEA came on the scene." Motions Hr'g Tr., vol. II at 68 (Feb. 6, 2001). Accordingly, the claim that the Mansfield Amendment was violated fails on its face, and we need not decide whether a violation of the Amendment would strip the court of jurisdiction. *Cf. United States v. Zabaneh*, 837 F.2d 1249, 1261 (5th Cir. 1988) ("Even if the district court had found that government agents were involved in appellant's arrest in Guatemala, Congress has not provided sanctions or penalties by way of relief for persons arrested in contravention of § 2291(c)(1).").

B

The defendants next allege that the district court erred in failing to require the government to provide them with certain information during the pretrial discovery process.  We review such claims for abuse of discretion and will not reverse unless the alleged error resulted in prejudice to the defendants' substantial rights. *See United States v. Gale*, 314 F.3d 1, 6 (D.C. Cir. 2003); *United States v. McCrory*, 930 F.2d 63, 69 (D.C. Cir. 1991).

The defendants contend that the government was required to disclose both the substance of the cooperating witnesses' prior statements and their identities prior to trial.  We are perplexed by this claim, and not only because the law is generally to the contrary. *See* 18 U.S.C. § 3500(a) (providing that "no statement" of a government witness "shall be the subject of discovery[] or inspection until said witness has testified on direct examination" at trial); *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (noting that "'[t]here is no general constitutional right to discovery in a criminal case'" (quoting *Weatherford v. Busey*, 429 U.S. 545, 559 (1977))).  We are particularly perplexed because the government *did* both produce the statements and disclose the witnesses' identities before trial. The defendants' brief concedes that they received redacted witness statements in April 2001 and June 2001. *See* Appellants' Br. 47.  Although the record does not show exactly what the defendants received in April 2001, it does reveal that the June 2001 disclosures substantially recounted the events and statements about which the witnesses testified at trial. *See* Appellee's Supp. App. 23-27, 48-49.  Moreover, on September 23, 2001 -- two weeks before the trial commenced -- the government produced unredacted statements that disclosed the identities of the cooperating witnesses. *See id.* at 55-56.

The defendants also argue that the court erred in failing to require the government to produce recordings made of the trial in Costa Rica of one of their alleged (non-testifying) co-conspirators, Johnny Morales Cooper. The defendants concede that neither tapes nor transcripts of the trial were within the government's possession, custody, or control, which would have triggered the government's disclosure obligations under Rule 16. *See* FED. R. CRIM. P. 16(a)(1)(E). Nonetheless, they argue that the prosecution "clearly had the power to secure the trial tapes or transcripts" from the Costa Rican government because it "was authorized by its Mutual Legal Assistance Treaty" with Costa Rica "to seek such information." Appellants' Br. 55. "Given this authority," the defendants conclude, "it was an abuse of discretion for the district court to summarily rule that because the government did not have the tapes or transcripts in its 'personal' possession, it had no obligation to use its best efforts through the [Treaty] to obtain them." Appellants' Br. 55.

We do not agree. The government's obligation was to comply with Rule 16, and there is no dispute that it did so. Having the authority "to seek" tapes or transcripts through a treaty is not the same thing as having "the power to secure" them. *Id.* Moreover, we note that the government provided the defense with what it did have -- summaries of the Morales Cooper trial, *see* Motions Hr'g Tr., vol. I at 52 (Feb. 5, 2001) -- and that defense counsel traveled to Costa Rica to interview Morales Cooper, thus undermining any claim of prejudice. In addition, although the defense could have asked the district court to issue letters rogatory to the Costa Rican court to obtain any tapes or transcripts that may have existed, it did not do so. *See* 28 U.S.C. § 1781(b)(2) (authorizing "the transmittal of a letter rogatory or request directly from a tribunal in the United States to [a] foreign or international tribunal, officer, or agency"). "The fact that [the defendants] did not exhaust th[is] alternative[] only serves to undermine further" their demand for

a new trial. *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989).

C

The defendants also claim that the district court erred in refusing to compel the government to provide a bill of particulars. "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987). The determination of whether a bill of particulars is necessary "rests within the sound discretion of the trial court" and will not be disturbed absent an abuse of that discretion. *Id.* at 1194; *see* FED. R. CRIM. P. 7(f) ("The court *may* direct the government to file a bill of particulars." (emphasis added)). To establish an error, the defendants must "demonstrate surprise or prejudice by the lack of particularization." *United States v. Pollack*, 534 F.2d 964, 970 (D.C. Cir. 1976).

We find no abuse of discretion in the district court's denial of the defendants' motion for a bill of particulars. As the district court found, the superseding indictment "identifies what the object of the conspiracy is as is required by [21 U.S.C. § 963,] . . . provides a time period of the conspiracy, . . . identifies the statutes that the object of the conspiracy violated[,] . . . has an identification of the proper mens rea required under Section 963[,] . . . [and] identifies at least five countries where the conspirators acted." Motions Hr'g Tr., vol. V at 51 (March 13, 2001). Although the indictment did not allege any overt acts, the district court correctly found that "the language of Section 963 does not call for any to be set forth in an indictment, nor do[] any . . . have to have been committed in order for a [§] 963

[violation] to be proven." *Id*. at 52; *see United States v. Shabani*, 513 U.S. 10, 15 (1994) (holding that the government need neither allege nor prove the commission of an overt act to establish a violation of 21 U.S.C. § 846, which is worded identically to 21 U.S.C. § 963).

The defendants insist that, because the original indictment charged a conspiracy that took place in 1998, they thought the trial would concern only the drug seizures that occurred in October of that year. Thus, they say, they were surprised by testimony regarding acts that happened between 1996 and 1999. Specifically, the defendants complain that, because the indictment "contained no overt acts or any other specific information," they were "ambushed at trial by the testimony of [cooperating witnesses] Gallardo Funez and Jose Sanchez, . . . who both testified about drug trafficking activities involving quantities of drugs . . . in places and under circumstances [the defendants] were not advised of prior to trial." Appellants' Br. 79.

We do not understand why the defendants felt surprised, nor how they could consider themselves ambushed. Although the initial indictment charged a conspiracy occurring in 1998, the superseding indictment -- filed more than 16 months before trial -- expanded the dates to cover the period from 1995 to 2000. And while the superseding indictment did not itself detail the drug trafficking activities about which the cooperating witnesses testified, the DEA-6s recounting those witnesses' pretrial statements did. *See Butler*, 822 F.2d at 1193 ("[I]f the requested information is available in some other form, then a bill of particulars is not required."). As noted above, the DEA-6s were provided in redacted form at least four months before trial, and in unredacted form more than two weeks before. This court has examined those statements in detail. We can only conclude that if the defendants felt ambushed, it was not because the

government was lying in wait, but because the defendants were not looking.

D

In a final challenge to the district court's pretrial rulings, defendant Rios contends that the court erred in failing to grant his motion to sever his trial from Mejia's pursuant to Federal Rule of Criminal Procedure 14, which provides that the court "*may* . . . sever the defendants' trials" if trying them together "appears to prejudice a defendant." FED. R. CRIM. P. 14 (emphasis added). The Supreme Court has stressed that "a district court should grant a severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The severance determination is left to the "sound discretion" of the trial court and will not be reversed absent abuse of that discretion. *Id*. at 539. The trial judge is "usually in the best position to evaluate the resulting degree of prejudice, and jury instructions generally are sufficient to minimize any disparities in evidence." *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1988).

The strongest argument Rios made to the district court in favor of severance was that the government intended to introduce out-of-court statements by Mejia that inculpated Rios, thus risking a Confrontation Clause problem since Mejia was not expected to testify (and did not do so). *See Bruton v. United States*, 391 U.S. 123, 137 (1968). Although Rios restated that argument in his opening brief in this court, he was forced to concede in reply that the government never introduced those statements. Appellants' Reply Br. 29. Hence, he suffered no prejudice on this account.

Rios' remaining justification for severance is the claim that his participation in the alleged conspiracy was de minimis. Although that characterization greatly understates Rios' role, it is certainly true that the bulk of the trial evidence concerned Mejia rather than him. But while "[s]everance may be required . . . when the evidence against one defendant is far more damaging than the evidence against the other defendant," we will not find an abuse of discretion if the "jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991) (internal quotation marks omitted).

Here, the government introduced "independent and substantial evidence" against Rios, *id*. (internal quotation marks omitted), including his admission that he participated in smuggling more than 100 kilograms of cocaine from Panama into Costa Rica during 1998 and that he obtained beepers and cell phones, rented vehicles, apartments and stash sites, and coordinated with other members of the charged conspiracy to facilitate cocaine smuggling activity. Witnesses also identified Rios' voice on eight taped conversations from the Costa Rican wiretapping investigation. Moreover, the district court expressly cautioned the jury to "give separate consideration and render separate verdicts with respect to each defendant," because "[e]ach defendant is entitled to have his guilt or innocence of the crime for which he is on trial determined from his own conduct." Trial Tr., vol. XIX-A at 23 (Nov. 13, 2001). Accordingly, we find "insufficient cause to attribute the jury's guilty verdict against [Rios] to its failure to segregate the relevant evidence in this case." *Halliman*, 923 F.2d at 885.

III

The defendants' allegations of error do not end with the district court's pretrial rulings. They challenge several of the

court's trial rulings as well. They jointly dispute the admission of testimony from the government's cooperating witnesses, as well as the testimony of its experts. Mejia individually argues that the admission of a post-arrest statement made by Rios violated his Sixth Amendment right to confrontation. Together, the defendants also raise a general challenge to the sufficiency of the evidence supporting their convictions.

A

The defendants contend that the district court wrongly permitted cooperating witnesses Funez and Sanchez to testify about the "trafficking of huge quantities of cocaine in 1996 and 1997, long before the three seizures of cocaine in October 1998." Appellants' Br. 28.[6] According to the defendants, because "the three October 1998 seizures [were] the only events and only quantities upon which the indictment was based," Appellants' Br. 29-30, the testimony regarding the 1996 and 1997 transactions constituted "[e]vidence of other crimes," which, under Federal Rule of Evidence 404(b), "is not admissible to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b).

This argument simply ignores the superseding indictment issued in this case. Although the conspiracy charged in the initial indictment was indeed limited to 1998, that charged in the superseding indictment covered the period from 1995 through

---

[6]The transaction about which Funez testified took place in 1996, when he assisted Mejia in transporting 700 kilograms of cocaine, 100 of which Mejia intended to sell in Los Angeles. Trial Tr., vol. XI-B at 19 (Oct. 30, 2001). The transaction Sanchez discussed occurred in 1997, when Mejia told him that a 1,400 kilogram shipment was going to California, Texas, and New York. Trial Tr., vol. XIII-A at 31-32 (Nov. 1, 2001). *See supra* Part I.

2000. *See* J.A. 5 (superseding indictment); Trial Tr., vol. XIV-A at 139 (Nov. 2, 2001) (statement by the district court) ("[I]t has been very clear that [the] indictment was one which charged a conspiracy from . . . 1995 through 2000."). Therefore, the 1996 and 1997 transactions about which the witnesses testified did not constitute "other crimes" evidence, but rather evidence of *this* crime -- the crime with which the defendants were charged. And in "cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *United States v. Badru*, 97 F.3d 1471, 1475 (D.C. Cir. 1996) (internal quotations and citation omitted).[7]

B

The defendants next raise challenges to the admission of testimony from two of the government's experts: Inspector Siegfredo Sanchez, who led the Costa Rican investigation, and Michael Garland, a former DEA agent who was not involved in the instant investigation. We review the district court's admission of expert testimony for abuse of discretion. *See United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993); *United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992).

---

[7]The defendants suggest that the district court initially ruled that the 1996 and 1997 transactions were "'outside the charged conspiracy,'" Appellants' Reply Br. 10 (quoting Trial Tr., vol. XI-A at 129 (Oct. 30, 2001)), but then erred in permitting Funez and Sanchez to testify about them. This mischaracterizes the court's ruling. The district court recognized that "the charged conspiracy" ran "from [19]95 to 2000." Trial Tr., vol. XI-A at 129 (Oct. 30, 2001). The proffered testimony that the court said would be "outside" the charged conspiracy related to earlier years, *see id.*; *see also id.* at 135, and is not at issue on this appeal.

1.   Inspector Sanchez testified as an expert regarding "coded phrases with respect to the drug trade," Trial Tr., vol. III-B at 18 (Oct. 18, 2001), and employed that expertise to explain the meaning of the defendants' wiretapped conversations.  The defendants raise two principal objections to the admission of Inspector Sanchez's testimony.

First, the defendants challenge Inspector Sanchez's expertise under Federal Rule of Evidence 702.  They argue that he was not properly qualified as an expert in coded words and phrases because "the court qualified him as an expert based solely on his testimony that he had investigated drug trafficking and 'analyzed' drug trafficking for a long time." Appellants' Br. 74.   The defendants' description of the basis of Inspector Sanchez's proficiency is correct:  his expertise was established through testimony that he had learned the "lexicon" used by drug traffickers "over the many years of listening to an infinite number of conversations."  Trial Tr., vol. II-B at 44 (Oct. 18, 2001); *see id.* at 49 (testimony that Inspector Sanchez had listened to and analyzed "many thousands" of coded words and phrases during drug trafficking investigations).   But the Advisory Committee's notes to Federal Rule of Evidence 702 specifically contemplate that this kind of experience can qualify a witness as an expert on coded phrases used in drug trafficking:

> [W]hen a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. *The method used by the agent is the application of extensive experience to analyze the meaning of the conversations.*  So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

FED. R. EVID. 702 advisory committee's note (emphasis added). More generally, there is a well-established practice of law enforcement officers testifying, on the basis of their experience, as experts in the modus operandi of drug trafficking organizations. *See United States v. Doe*, 903 F.2d 16, 19 & 19 n.21 (D.C. Cir. 1990) (citing cases). The court's admission of Inspector Sanchez's testimony was in accordance with these precedents and did not constitute an abuse of discretion.

Second, the defendants complain that the district court abused its discretion in permitting Inspector Sanchez to testify "far beyond his purported expertise." Appellants' Br. 75. But while our review of the inspector's testimony discloses that on occasion he did stray beyond the interpretation of coded phrases, it also reveals that defense counsel rarely made contemporaneous objections. On most occasions upon which the defense did raise such objections, the district court properly sustained them; when the court overruled an objection, any error was harmless in light of Agent Garland's properly admitted testimony on the same point. *See supra* p. 7; *infra* pp. 23-24. Moreover, at the close of the testimony, the court entertained a motion to strike Inspector Sanchez's testimony -- notwithstanding the motion's untimeliness -- and did in fact strike eight lines of testimony. We find no reversible error in the manner in which the district court supervised the admission of Inspector Sanchez's testimony.[8]

---

[8]The defendants also complain that the government failed to provide them in advance with a "written summary" of Inspector Sanchez's expert "opinions [and] the bases for these opinions," as required by Rule 16. FED. R. CRIM. P. 16(a)(1)(G). Because they did not object to Inspector Sanchez's testimony on this ground until after he had already testified, our review is limited to plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). And because the defendants have not demonstrated "how or why the verdict would

2.  The defense also objects to the admission of testimony by the government's other expert -- former DEA Agent Garland -- who testified regarding the modus operandi of drug trafficking organizations in Central and South America.  The defendants assert that Garland contravened Federal Rule of Evidence 704(b), which bars an expert witness from stating an opinion "as to whether *the defendant* did or did not have the mental state or condition constituting an element of the crime charged."  FED. R. EVID. 704(b) (emphasis added).  Agent Garland, however, never offered an opinion regarding the mental state of the defendants.

The single testimonial exchange to which defendants object unfolded as follows:

> Q:  Do the drug trafficking organizations know the ultimate destination of the goods that they traffic even if it's only part of the way?
>
> A:  They don't know the ultimate destination per city, per street, per warehouse, but they know it's going to the United States.

Trial Tr., vol. I-B at 133 (Oct. 16, 2001).  In context, it is plain that Garland was testifying about drug organizations in general, and not the defendants' organization in particular.  To remove any doubt on that score, the district court immediately interjected: "Just to be clear, Mr. Garland, you don't testify here today with any personal knowledge about any intent on the part of either of the gentlemen seated at this table here in connection

---

have been different" if they had received a Rule 16(a)(1)(G) disclosure, they have failed to establish the prejudice required for reversal.  *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997).

with any facts in this case, is that correct?" *Id*. at 134. Garland answered in the affirmative. *Id*. That intervention was sufficient to ensure that admission of the testimony was not erroneous.[9]

## C

Appellant Mejia individually charges that the district court's admission of a post-arrest statement by Rios, tending to show that Rios feared Mejia, violated Mejia's Sixth Amendment right to confrontation. At trial, DEA Agent Chavarria testified that, in the course of questioning Rios in Fort Lauderdale, he asked whether Rios knew Mejia. According to Agent Chavarria:

> [W]hen I first asked [Rios] if he knew [Mejia], he looked to me and then he looked down, and then he specifically said, "What can you guarantee in terms of my family's safety in Colombia?" And, of course, I told him we couldn't guarantee him anything. And then he immediately responded that he didn't know [Mejia].

---

[9]*See United States v. Smart*, 98 F.3d 1379, 1388 (D.C. Cir. 1996) (declaring that expert "testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes" (internal quotation marks omitted)); *United States v. Williams*, 980 F.2d 1463, 1466 (D.C. Cir. 1992) (holding that a potential error in an expert's testimony regarding the "intentions of the person who possessed those bags" was cured by the expert's affirmative response to the court's interjected question: "You aren't referring and you have no knowledge, I take it, about this particular case?").

Trial Tr., vol. X-B at 20 (Oct. 29, 2001). Mejia contends that the recitation of this statement by Rios was barred by *Bruton v. United States*, which held that the admission of a non-testifying co-defendant's statement, expressly implicating a defendant, violated the latter's rights under the Confrontation Clause of the Sixth Amendment. *Bruton*, 391 U.S. at 137.

Mejia did not object to the admission of Rios' statement in the district court, and our review is therefore limited to plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993) (holding that an appellate court may not reverse on the basis of an unobjected-to error unless it is "plain," "affect[s] substantial rights," and "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings" (internal quotation marks and citation omitted)); FED. R. CRIM. P. 52(b). Even assuming that the admission of the statement was error, it did not rise to the level of plain error. The prejudicial impact of the statement was indirect: what inference the jury might have drawn regarding Mejia's guilt from an inference of Rios' fear is speculative at best.[10] Any such prejudice was mitigated by a cautionary instruction that the district court gave to the jury.[11] Moreover,

---

[10]*Cf. Bruton*, 391 U.S. at 135 (reversing conviction where the co-defendant's statement, which expressly implicated the defendant as a participant in the crime, was "powerfully incriminating"); *see generally Gray v. Maryland*, 523 U.S. 185, 195-96 (1998); *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

[11]The court instructed the jury: "One defendant's statement made at a time after his arrest constitutes evidence only against the defendant making it. It is not evidence against the other defendant. You must not consider it in any way in determining the guilt or innocence of the other defendant." Trial Tr., vol. XIX-A at 23 (Nov. 13, 2001); *see United States v. Johnson*, 767 F.2d 1259, 1274 (8th Cir. 1985) (holding that the court's "limiting instruction eliminated the chance of plain error" after a police officer testified concerning the

it was vastly outweighed by the overwhelming evidence of Mejia's guilt.[12]

## D

Finally, the defendants challenge the sufficiency of the trial evidence proving that they conspired to distribute cocaine with the intent or knowledge that it would be unlawfully imported into the United States. *See* 21 U.S.C. §§ 959(a), 963. Our review of the government's proof is limited: We must accept the jury's guilty verdicts if we conclude that "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (internal quotations and citation omitted).

---

out-of-court statements of an absent defendant that implicated a co-defendant).

[12]*See United States v. Richards*, 241 F.3d 335, 337 (3d Cir. 2001) (finding that, although the admission of a non-testifying co-defendant's out-of-court statement incriminating the defendant was *Bruton* error, it did not amount to plain error because of overwhelming independent evidence of the defendant's guilt); *United States v. Brazel*, 102 F.3d 1120, 1141 (11th Cir. 1997) (same where there was "abundant properly admitted evidence linking" the defendant to the crime, and the improperly admitted statement "added little if anything more to the government's case").

In its order denying the defendants' motion for a judgment of acquittal, the district court found that the evidence was "more than sufficient to establish that both defendants were involved in a criminal conspiracy." *United States v. Mejia*, No. 99-389, Mem. Op. & Order at 10 (D.D.C. May 14, 2002). We agree. As detailed by the district court and recounted in Part I above, evidence of the conspiracy included the tape-recorded conversations in which the defendants discussed, in code, numerous drug transactions. Inspector Sanchez decoded those conversations and linked them to seizures of cocaine. Multiple witnesses identified the voices of both defendants on those tapes. Moreover, Mejia made oral statements and Rios provided a written statement to the DEA, confessing their involvement in an international drug transportation network.

The district court likewise concluded -- and again we agree -- that there was sufficient evidence for the jury to find that the "intent of the defendants and the object of the conspiracy was to import cocaine into the United States." *Id*. at 12. Evidence of the defendants' intent and knowledge was both circumstantial and direct. *See United States v. Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992) (holding that proof that the defendant knew drugs were to be imported into the United States "may take the form of circumstantial as well as direct evidence"). Former DEA Agent Garland provided expert testimony noting that the drugs were seized on the principal land route for cocaine from Panama to the United States and were hidden in ways that suggested the cocaine was headed for the United States. In addition, cooperating witnesses Funez and Sanchez testified about trafficking drugs to the United States with Mejia in 1996 and 1997, and both testified that Mejia told them the drugs were destined for the United States. Indeed, Mejia himself confessed to being a part of an organization involved in shipping cocaine to the United States.

Notwithstanding the district court's denial of his motion for judgment of acquittal, Mejia separately insists that the court's refusal, at sentencing, to attribute to him a total of 355 kilograms of cocaine seized from three shipments during 1998 "was tantamount to a reconsideration and reversal of the court's previous denial of his motion." Appellants' Br. 16. Given that the court went on to attribute 2,374 other kilograms to Mejia and to sentence him to 400 months in prison, Sentencing Hr'g Tr. 46-47 (July 10, 2002), Mejia's insistence that the court "had a change of heart about the case," Apellants' Br. 16, rings hollow. Rather, as the court explained, it found it "unnecessary to deal with the 355, given how it was not dealt with to [the court's] satisfaction in the [government's sentencing] memo" and given that it would not "make a difference with respect to the ultimate adjustment of offense level." Sentencing Hr'g Tr. 59 (July 10, 2002).

At bottom, Mejia's argument is just another variant on the defendants' theme that the indictment only charged them with transactions relating to the October 1998 seizures. But saying that -- even repeatedly -- does not make it so. The superseding indictment charged the defendants with a conspiracy that ran from 1995 to 2000, and the evidence was more than sufficient to warrant their convictions whether or not the cocaine seized in 1998 was included in the sentencing calculations.

IV

We next consider two post-trial issues, each of which necessitates a limited remand under the case law of this Circuit.

A

Almost a year after the jury's verdict was entered, defendant Rios moved for a new trial based on a claim that his

attorney had provided ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 691-92 (1984). The district court denied the claim as untimely under Federal Rule of Criminal Procedure 33, and Rios, represented by new counsel, renews that claim here.

In *United States v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003), we held that, when a defendant asserts an ineffective assistance claim for the first time on appeal, our "'general practice is to remand the claim for an evidentiary hearing' unless 'the trial record alone conclusively shows' that the defendant either is or is not entitled to relief." *Rashad*, 331 F.3d at 909-10 (quoting *United States v. Fennell*, 53 F.3d 1296, 1303-04 (D.C. Cir. 1995)). Although Rios first asserted his ineffective assistance claim in the district court, the court did not hold an evidentiary hearing because the assertion was untimely. As a consequence, we are in the same position as if the claim had first been raised on appeal: the record does not conclusively show whether or not the defendant is entitled to relief. Accordingly, we must remand this claim to the district court for an evidentiary hearing.

B

We must also remand the defendants' sentencing claims. Almost three years after the district court sentenced the defendants in this case, the Supreme Court issued its decision in *United States v. Booker*, 543 U.S. 220 (2005). *Booker* held that the enhancement of a defendant's sentence pursuant to a mandatory Sentencing Guidelines regime, based on facts not submitted to the jury, violates the Sixth Amendment. *See Booker*, 543 U.S. at 244. There is no dispute that the sentences of defendants Mejia and Rios contain *Booker* errors. These include mandatory enhancements based on attributable drug amounts and on the role of each defendant in the offense. *See*

U.S. SENTENCING GUIDELINES MANUAL §§ 2D1.1(c)(1), 3B1.1 (2001).

At his sentencing, Mejia raised a Sixth Amendment objection based upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000) -- the progenitor of the Court's decision in *Booker*. Accordingly, unless the errors in his sentencing were harmless, *see* FED. R. CRIM. P. 52(a), Mejia's sentence must be vacated and his case remanded to the district court for resentencing. *See United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005). To establish harmlessness, the government must demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the [sentence] obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). The government concedes that it cannot satisfy that standard, and that we must remand Mejia's case for resentencing consistent with *Booker*. *See* Appellee's Br. 52.

Rios, by contrast, did not raise a Sixth Amendment objection to his sentencing in the district court. His appeal is therefore governed by the plain error standard, *see* FED. R CRIM. P. 52(b), and by this circuit's application of that standard to *Booker* errors in *United States v. Coles*, 403 F.3d 764 (D.C. Cir. 2005), and *United States v. Gomez*, 431 F.3d 818 (D.C. Cir. 2005). *Coles* and *Gomez* set forth the following paradigm: "[I]n a *Booker* plain-error case: (1) if the record establishes a reasonable likelihood that the sentence would have been lower [had the district court known to apply the law as subsequently announced in *Booker*], we remand for full resentencing; (2) if the record makes us confident that the sentence would not have been lower, we affirm; and (3) if neither of the above, we grant a limited remand." *Gomez*, 431 F.3d at 824.

This case falls into the "neither of the above" category, *id*., because "the record simply is not sufficient for an appellate court to determine prejudice with any confidence." *Coles*, 403

F.3d at 769. At sentencing, the district court said nothing from which we can deduce what course it would have taken in the absence of a mandatory Guidelines regime. *See id.* at 769-70. Given the limitations of the record, we follow *Coles* and *Gomez* and grant a limited remand of Rios' claim: "While retaining jurisdiction over the case, we remand the record to the District Court . . . to determine whether it would have imposed a different sentence materially more favorable to the defendant had it been fully aware of the post-*Booker* sentencing regime." *Coles*, 403 F.3d at 770.

V

Finally, we address an issue regarding classified information that was not addressed in the parties' initial briefs.

A

On October 4, 2001, five days before the defendants' trial was scheduled to begin, the Drug Intelligence Unit (DIU) of the Justice Department's Narcotic and Dangerous Drug Section filed an ex parte, in camera motion under seal with the district court. Pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C. App. III, § 4, and Federal Rule of Criminal Procedure 16(d)(1), the DIU sought review and protection from disclosure of certain classified information[13] related to the defendants and arguably subject to discovery under the Federal Rules. The DIU's motion represented that none of the investigators or attorneys involved in the prosecution (or

---

[13]CIPA defines "classified information" as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security." 18 U.S.C. App. III, § 1.

defense) of the case knew of the existence or content of the classified material, nor had they been made aware of the filing of the motion by the DIU. After examining the material ex parte and in camera, the district court determined that it was not subject to discovery under *Brady v. Maryland*, 373 U.S. 83 (1963), and issued a sealed protective order. In the event that either defendant was convicted, the order required the DIU to provide notice of the protective order to the court of appeals, which it subsequently did by letter.

On August 5, 2005, the DIU filed a motion under seal with this court requesting permission to transfer the district court's protective order and the underlying materials for our in camera review. The DIU advised that both the prosecution and the defense remained unaware of the ex parte proceedings below. In response, we issued orders directing the government to show cause why the fact of its filings in this and the district court -- not the content of the materials the filings sought to protect -- should remain sealed. The DIU responded by contending that disclosure would not be useful to the defendants, and by quoting our statement in *United States v. Yunis* that "[t]hings that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods." *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) (*Yunis I*).

The quotation from our opinion in *Yunis I* referred to disclosure of the underlying classified documents in that case and was expressly based on "what th[o]se documents revealed." *Id*. It did not refer to mere notice of the government's efforts to protect those documents -- a fact that was on the public record in *Yunis I*. *See id.* at 619-20. Although there may be situations in which the fact that the government has sought a protective order could itself create a risk of harm, *see United States v.*

*Innamorati*, 996 F.2d 456, 488 (1st Cir. 1993), the DIU made no such showing in this case. To the contrary, and despite our issuance of a second order giving it a second opportunity to show cause, the DIU offered no reason at all why disclosing the fact of its filings here could cause injury.

On September 6, 2005, after concluding that the DIU had failed to justify keeping the fact of its filings secret and that the views of the defense regarding the legal issues at stake would be useful to the court, we issued an order notifying the parties that the ex parte filings had taken place. In so doing, we followed the lead of the First Circuit in *United States v. Innamorati*. *See id.* at 487. The order did not disclose anything about the materials that were reviewed by the district court and subject to its protective order. Because counsel for both sides had been unaware of the filings when their initial appellate briefs were submitted, we directed them to submit supplemental briefs addressing "whether, to what extent, and under what circumstances CIPA § 4 and Federal Rule of Criminal Procedure 16(d)(1) authorize the non-disclosure of information otherwise arguably subject to discovery under Rule 16." *United States v. Mejia*, No. 02-3067, Order at 2 (D.C. Cir. Sept. 6, 2005). We now proceed to consider those issues with the benefit of that briefing.

B

Rule 16 of the Federal Rules of Criminal Procedure, entitled "Discovery and Inspection," sets forth categories of "[i]nformation [s]ubject to [d]isclosure" by the government in a criminal case. FED. R. CRIM. P. 16(a)(1). The district court granted the DIU's motion for a protective order against the production of certain classified documents that the DIU characterized as arguably subject to discovery under Rule 16.

In support, the court cited CIPA § 4, entitled "Discovery of classified information by defendants," which provides in part:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure . . . . The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone.

18 U.S.C. App. III, § 4.[14]  The district court also relied on Federal Rule of Criminal Procedure 16(d)(1), entitled "Protective and Modifying Orders," which provides:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection . . . . The court may permit a party to show good cause by a written statement that the court will inspect ex parte.

FED. R. CRIM. P. 16(d)(1).

The defendants argue that CIPA is a procedural statute that does not itself create a privilege against discovery of classified information.  We agree.  Indeed, we said as much in *Yunis I*. *See* 867 F.2d at 621 (declaring that CIPA § 4 "creates no new

---

[14]Section 4 further provides that, "[i]f the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal." 18 U.S.C. App. III, § 4. It was pursuant to this provision that the district court ordered the DIU to advise this court of the ex parte proceedings. *See also* FED. R. CRIM. P. 16(d)(1).

rights of or limits on discovery of a specific area of classified information").[15] CIPA § 4 was, however, intended to "clarify" a court's existing "powers under Federal Rule of Criminal Procedure 16(d)(1)" to protect classified information. SEN. REP. NO. 96-823, at 6 (1980).[16] In *Yunis I*, we recognized that, "[w]hile CIPA creates no new rule of evidence regarding admissibility, the procedures it mandates protect a government privilege in classified information." 867 F.2d at 623.

To give content to the classified information privilege, *Yunis I* adopted the test that the Supreme Court had applied to the "informant's privilege" in *Roviaro v. United States*, 353 U.S. 53 (1957). *Yunis I*, 867 F.2d at 622. Under that test, the reviewing court must first find that the information "crosse[s] the low hurdle of relevance," *id*. at 623, a hurdle that we assume for the sake of argument has been surmounted here. Second, the court must determine whether "the assertion of privilege by the government is at least a colorable one." *Id*. As in *Yunis I*, "our

---

[15]*See also* H.R. REP. NO. 96-1436, at 12 (1980) (Conf. Rep.) (stating that "nothing in [CIPA] is intended to change the existing standards for determining relevance and admissibility"); H.R. REP. NO. 96-831, pt. 1, at 27 (1980) (stating that CIPA § 4 "is not intended to affect the discovery rights of a defendant").

[16]*See* SEN. REP. NO. 96-823, at 6 ("This clarification [was] necessary because some judges ha[d] been reluctant to use their authority under [Rule 16] although the advisory comments of the Advisory Committee on Rules state[d] that 'among the considerations [to be] taken into account by the court' in deciding on whether to permit discovery to be 'denied, restricted or deferred' would be 'the protection of information vital to the national security.'" (quoting FED. R. CRIM. P. 16 advisory committee's note)); *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) ("Congress intended section 4 to clarify the court's powers under Fed. R. Crim. P. 16(d)(1) to deny or restrict discovery in order to protect national security.").

ex parte in camera review of the classified information in this case convinces us that the claim of the government to privilege is a great deal more than merely colorable." *Id*. (italicization omitted). Third, and most significant, *Yunis I* held "that classified information is not discoverable on a mere showing of theoretical relevance . . . [;] the threshold for discovery in this context further requires that [the information be] . . . *at least 'helpful to the defense of [the] accused.'*" *Id*. (quoting *Roviaro*, 353 U.S. at 60-61) (emphasis added); *see United States v. Yunis*, 924 F.2d 1086, 1095 (D.C. Cir. 1991) (*Yunis II*).[17]

As in *Yunis I*, we have carefully examined the classified information at issue and conclude that it "falls far short" of the "helpful or beneficial character" necessary to meet the threshold showing for overcoming the privilege. 867 F.2d at 624.[18] We

---

[17]Other circuits have adopted a similar test. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (holding that, "[i]n order to determine whether the government must disclose classified information, the court must determine whether the information is 'relevant and helpful to the defense'" (quoting *Yunis I*, 867 F.2d at 623)); *United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990) (noting that, in CIPA cases, "the government is not required to provide criminal defendants with information that is neither exculpatory nor, in some way, helpful to the defense" (citing *Yunis I*, 867 F.2d at 617)); *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985) (applying *Roviaro* test to the assertion of privilege in a CIPA case).

[18]Because the classified information does not reach the threshold of being helpful to the defense, we need not decide whether the district court should have considered the protective options short of full disclosure that are set forth in CIPA § 4, namely, permitting the government "to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C.

have made that determination on the basis of a de novo review, notwithstanding that in the ordinary case we would review a district court's issuance of a protective order only for abuse of discretion. *See id*. at 622; *United States v. Rezaq*, 134 F.3d 1121, 1142-43 (D.C. Cir. 1998). We have conducted our review de novo because the district court did not determine whether the classified material would be helpful to the defendants under the *Yunis I* standard, but rather stated only that it was not subject to disclosure under *Brady v. Maryland*. *Brady* and its progeny hold that due process requires the disclosure of information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching" of a government witness. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999).[19] While *Brady* information is plainly subsumed within

---

App. III, § 4; *see also* FED. R. CRIM P. 16(d)(1) (authorizing a court, for good cause, to "deny, restrict, or defer discovery," or to "grant other appropriate relief"). As in *Yunis I*, we also need not consider whether, if the information were helpful, it could nonetheless be withheld if "the government's need to keep the information secret" outweighed the "defendant's interest in disclosure." 867 F.2d at 625; *see also Yunis II*, 924 F.2d at 1095 (noting that, although other circuits have "endorsed a balancing approach" when the threshold showings have been made, this court has not had the occasion to do so). In particular, we need not decide whether a defendant's interest in information that is helpful, but that does not rise to the level that is subject to disclosure under *Brady v. Maryland*, can overcome the government's interest in protecting properly classified information. *Cf. United States v. Galston*, 357 F.3d 77, 84 (D.C. Cir. 2004) (discussing whether *Roviaro* requires disclosure of an informant's identity that is merely "relevant or helpful," but that is not "essential to the defense" (internal quotation marks and citations omitted)).

[19]*See also Strickler*, 527 U.S. at 280 (stating that the government must disclose "evidence favorable to an accused . . . where the

the larger category of information that is "at least helpful" to the defendant, information can be helpful without being "favorable" in the *Brady* sense -- a point to which we alluded in *Yunis I*.[20] *See also Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). Accordingly, in the absence of a district court finding as to whether the withheld material meets the standard articulated in *Yunis I*, we have examined the documents de novo and on that basis conclude that they are not helpful to the defense.

The defendants insist that CIPA contemplates that judicial determinations regarding the disclosure of classified information will be made with the participation of defendants and their counsel, and will not be made ex parte. But while CIPA §§ 5 and 6 establish procedures for participation by defendants in certain in camera hearings, those sections apply to the disclosure of classified information in trial or pretrial proceedings. 18 U.S.C. App. III, §§ 5(a), 6(a); *see* SEN. REP. NO. 96-823, at 7-8. CIPA § 4, by contrast, is the section that governs the

---

evidence is material either to guilt or to punishment" (quoting *Brady*, 373 U.S. at 87), and explaining that "evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'" (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985))).

[20]In *Yunis I*, we noted *Roviaro*'s statement that the informant's privilege must give way where the evidence is "'essential to a fair determination of a cause.'" *Yunis I*, 867 F.2d at 622 n.9 (quoting *Roviaro*, 353 U.S. at 60-61). We thought it "apparent that evidence 'essential to a fair determination of a cause' creates a different situation than" information that is "merely helpful," and that "[i]n the case of such 'essential' evidence, due process . . . might afford the defendant further relief." *Id*.

"*[d]iscovery* of classified information by defendants." 18 U.S.C. App. III, § 4 (emphasis added). And that section provides that "[t]he court may permit the United States to make a request [for a protective] order in the form of a written statement to be inspected *by the court alone*." *Id.* (emphasis added); *see* SEN. REP. NO. 96-823, at 6; H.R. REP. NO. 96-1436, at 10 (1980) (Conf. Rep.).

As the House Report explains, "since the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." H.R. REP. NO. 96-831, pt. 1, at 27 n.22 (1980). Similarly, Rule 16(d)(1) authorizes the court to permit a party to make its case for a protective order "by a written statement that the court will inspect ex parte." And the Advisory Committee's notes to Rule 16 offer an explanation similar to that in the House Report:

> In some cases it would defeat the purpose of the protective order if the government were required to make its showing in open court. The problem arises in its most extreme form where matters of national security are involved. Hence a procedure is set out where . . . the court may permit the government to make its showing, in whole or in part, in a written statement to be inspected by the court in camera.

FED. R. CRIM. P. 16 advisory committee's note.[21]

---

[21]*See Sarkissian*, 841 F.2d at 965-66 (holding that CIPA § 4 allows the court to assess a claim of privilege through an ex parte, in camera submission); *Innamorati*, 996 F.2d at 487 (noting that both CIPA and Rule 16(d)(1) authorize the court to deny discovery based on an ex parte showing by the government); *see also United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003).

We recognize, as we did in *Yunis I*, that the defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, are disadvantaged by not being permitted to see the information -- and thus to assist the court in its assessment of the information's helpfulness. *See* 867 F.2d at 624. For that reason, we have applied the "at least helpful" test in a fashion that gives the defendants the benefit of the doubt. *See generally Rezaq*, 134 F.3d at 1142-43; *Innamorati*, 996 F.2d at 488. We note, however, that while the defendants' predicament is difficult, it is not without close analogies. When a court (rather than the prosecutor alone, as is ordinarily the case) reviews evidence in camera to determine whether it constitutes a witness statement subject to disclosure under the Jencks Act, 18 U.S.C. § 3500(b), or exculpatory material subject to disclosure under *Brady*, the defendant is likewise "not entitled to access to any of the evidence reviewed by the court . . . to assist in his argument" that it should be disclosed. *United States v. Carson*, 2002 WL 31246900, at *1 (D.C. Cir. Oct. 2, 2002).[22]

Finding no support for the defendants' claim of the right to participation or access in CIPA or the Federal Rules, we turn to their constitutional arguments. The defendants contend that their Sixth Amendment right to confront witnesses was "eviscerated by . . . [the] denial of [their] participation in the decision as to whether . . . the material could be disclosed, and [by] the denial of an opportunity to review the materials." Appellants' Supp. Br. 7. That contention, however, is

---

[22]*See United States v. North Am. Reporting, Inc.*, 761 F.2d 735, 740 (D.C. Cir. 1985) (stating that it would "'defeat th[e] design [of the Jencks Act] to hold that the defense may see statements in order to argue whether it should be allowed to see them" (quoting *Palermo v. United States*, 360 U.S. 343, 354 (1959))); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (regarding exculpatory information).

foreclosed by the Supreme Court's decision in *Pennsylvania v. Ritchie*, which held that "the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination," and does not create a right to pretrial discovery. 480 U.S. 39, 52 (1987). Although *Ritchie* does not foreclose the defendants' further argument that the Fifth Amendment's Due Process Clause guarantees their access to certain categories of evidence in the possession of the government, *see id*. at 57, that right is limited to material within the compass of *Brady* and its progeny. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867-69 (1982); *Weatherford*, 429 U.S. at 545-46. And as noted above, our determination that the withheld information is not even helpful to the defendants necessarily means that the district court correctly found that it is not encompassed by *Brady*.

Finally, the defendants contend that the district court erred by not even giving them notice that the government had made an ex parte filing or that the court had issued a protective order. The statute is silent as to whether such notice is required. *See* 18 U.S.C. App. III, § 4; *see also* FED. R. CRIM. P. 16(d)(1).[23] But even if the court did err in failing to provide notice, any such error was harmless. As we have indicated above, notice would not have afforded the defendants the opportunity to participate in the district court's in camera inspection. And while notice could have given them the opportunity to brief the legal issues regarding CIPA and Rule 16, the order that this court issued -- coupled with de novo review -- made up for any deficit in that

---

[23]*Compare Gurolla*, 333 F.3d at 951 n.7 (stating that the defense must "be notified that the district court has made a ruling protecting classified material from disclosure"), *with Sarkissian*, 841 F.2d at 965 (holding that the "clear language of [CIPA] and its legislative history foreclose" the contention that "the government must file a public claim of privilege before making an ex parte in camera submission").

regard. More fundamentally, because the underlying classified material is unhelpful to the defendants, they did not suffer from its unavailability; and because that material was never shown to the jury, "there is no question here of convictions based upon secret evidence furnished to the factfinder but withheld from the defendants." *Innamorati*, 996 F.2d at 488.

In sum, we conclude that there is nothing about the government's or the district court's treatment of classified information that would justify granting the defendants' request to vacate their convictions.

## VI

We affirm defendant Mejia's conviction in all respects and remand his case for resentencing in light of *United States v. Booker,* 543 U.S. 220 (2005). While otherwise rejecting defendant Rios' challenges, we remand the record in his case to the district court for the limited purpose of: (1) determining "whether it would have imposed a different sentence materially more favorable to the defendant had it been fully aware of the post-*Booker* sentencing regime," *Coles*, 403 F.3d at 770; and (2) conducting further proceedings to consider the merits of Rios' ineffective assistance of counsel claim in accordance with *United States v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003).

*So ordered*.