**UNITED STATES of America,**

v.

**Homes VALENCIA–RIOS, Defendant.**

**Criminal Action No. 99–389–02 (RWR).**

United States District Court,
District of Columbia.

Aug. 5, 2009.

---

Carl Eurenius, U.S. Department of Justice, Washington, DC, for Plaintiff.

### MEMORANDUM OPINION AND ORDER

RICHARD W. ROBERTS, District Judge.

The court of appeals remanded this case in part for an evidentiary hearing regarding defendant Homes Valencia–Rios' claim that his trial counsel, Elita Amato, had provided ineffective assistance of counsel by committing numerous errors that allegedly prejudiced the outcome of his case. At the evidentiary hearing, the defendant failed to carry his burden of demonstrating that he received ineffective assistance of counsel at trial. This memorandum opinion sets forth findings of fact and conclusions of law explaining this conclusion.

## FACTUAL BACKGROUND

A more detailed history of the facts of this case can be found in *United States v. Mejia,* 448 F.3d 436 (D.C.Cir.2006). "From June through November 1998, Costa Rican law enforcement officers conducted an investigation of a drug trafficking organization in Costa Rica, ... involv[ing] multiple wiretaps, which captured Colombian nationals [Rafael] Mejia and [Valencia-]Rios discussing large drug transactions with other members of their drug trafficking organization." *Id.* at 438. Using information from the wiretaps, Costa Rican authorities intercepted three shipments of drugs in October 1998: 200 kilograms of cocaine from a truck at the border of Nicaragua and Costa Rica; 130 kilograms of cocaine from a truck at the border of Nicaragua and Honduras; and 25 kilograms of cocaine from a truck in Costa Rica. *Id.* at 439. Then, "[o]n November 30, 1999, a federal grand jury in the District of Columbia named Mejia and Rios in a one-count indictment that charged them with conspiring to distribute five or more kilograms of cocaine with knowledge and intent that such cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963." *Id.* The conspiracy was alleged to have existed from June 1998 until at least November 1998 and spanned throughout Colombia, Panama, Costa Rica, Guatemala, and Nicaragua.[1] *Id.*

Mejia and Valencia–Rios were arrested by Panamanian authorities and transferred to the custody of United States Drug Enforcement Agency ("DEA") agents Michael Chavarria and Joseph Evans in Panama City. En route to the United States, the

---

1. Before trial, the grand jury issued a superseding indictment that enlarged the time period of the alleged conspiracy as beginning no later than November 1995 and continuing until February 2000, but was otherwise identical to the original indictment. *Id.* at 439.

DEA agents advised Valencia–Rios of the charge against him and informed him of his *Miranda* rights. In Fort Lauderdale, Valencia–Rios "waived his rights and signed a written statement inculpating himself in drug trafficking in Central America." *Id.* Valencia–Rios "admitted to participating with ... co-conspirators in smuggling more than 100 kilograms of cocaine from Panama into Costa Rica during 1998[.]" *Id.* at 441. Trial counsel filed a pretrial motion to suppress Valencia–Rios' written statement, arguing that the statement was made involuntarily and obtained in violation of the defendant's Fourth and Fifth Amendment rights. After an evidentiary hearing during which Amato cross-examined Chavarria about the environment in which Valencia–Rios made his statement, Valencia–Rios' motion to suppress his written statement was denied.

Mejia and Valencia–Rios were tried together. The government presented the following evidence against Valencia–Rios. Nine tapes of telephone calls between Valencia–Rios and other members of the conspiracy were introduced into evidence.[2] *Id.* at 440. Witness Juan Delgado, an inmate who met Valencia–Rios during his pretrial incarceration, identified Valencia–Rios' voice on seven tapes. Inspector Sigifredo Sanchez, who led the Costa Rican investigation, and Chavarria identified Valencia–Rios' voice on eight tapes. Sanchez testified "as an expert in deciphering the coded language used by drug trafficking organizations, and he testified about the meaning of numerous conversations[,]" including Valencia–Rios' conversations. *Id.* DEA Agent Michael Garland testified "as an expert on drug trafficking organizations in Central and South America," and "testified that the principal market for drugs produced in Central and South America is the United States." *Id.* at 441 (internal

quotation marks omitted). "Chavarria and Evans testified regarding [Valencia–Rios'] post-arrest statements[,]" including Valencia–Rios' admission that he participated with co-conspirators to smuggle cocaine from Panama into Costa Rica. *Id.* The government also introduced into evidence Valencia–Rios' written statement obtained while he was in custody in Fort Lauderdale. During cross-examination, Amato elicited from Chavarria that Valencia–Rios wrote his statement in a small, windowless room in the Fort Lauderdale airport after being in custody for more than ten hours and before he was given an opportunity to call his wife. (*See* Trial Tr. vol. X–B, 10–71:25 to 10–74:6, Oct. 29, 2001.) Valencia–Rios did not testify at trial and was found guilty by a jury of the charged offense. *See Mejia*, 448 F.3d at 441. Post-trial proceedings ensued and sentencing was postponed.

Approximately one year after his conviction, but before sentencing, Valencia–Rios moved for a new trial, alleging that his trial counsel had provided ineffective assistance in the preparation and presentation of his trial defense. He alleged that his trial counsel failed to: (1) inform Valencia–Rios about investigative efforts undertaken in Panama and follow his instructions as to which witnesses should be investigated; (2) timely provide to Valencia–Rios a copy of his alleged confession; (3) produce a defense version of transcripts of the taped telephone calls that the government used at trial; (4) obtain and present a handwriting expert to analyze the handwriting in Valencia–Rios' written statement; (5) obtain and present expert testimony on voice identification to challenge the government's evidence identifying Valencia–Rios on the taped phone conversations; (6) introduce into evidence in support of the

**2.** The jury viewed transcripts translating the Spanish heard on the tapes into English.

defendant's motion to suppress his confession a diagram produced by the defendant purporting to be of the room where the government obtained his written statement; (7) obtain a copy of Valencia–Rios' Panamanian arrest order and arrest declaration to challenge his arrest and transfer to the United States; (8) obtain the testimony of potential exculpatory witnesses Jose Antonio Ortega, Clemencia Otalvaro Morales, and Johnny Webb; and (9) present as evidence co-defendant Mejia's failure to identify Valencia–Rios' photograph. Valencia–Rios' motion was denied as untimely under Federal Rule of Criminal Procedure 33. He was sentenced to 324 months in prison. Valencia–Rios appealed his conviction and renewed the same ineffective assistance of counsel claim on appeal.

The court of appeals affirmed Valencia–Rios' conviction for conspiring to unlawfully import more than 5 kilograms of cocaine into the United States, but remanded the case for "further proceedings to consider the merits of [Valencia–Rios'] ineffective assistance of counsel claim." *Id.* at 459. On remand, Valencia–Rios renewed the same nine allegations of ineffective assistance he raised in his untimely motion for a new trial. A hearing was held on the defendant's ineffective assistance claim at which the defendant and trial counsel Amato testified. At the hearing and in his proposed findings of fact and conclusions of law, Valencia–Rios raised a tenth reason why he received ineffective assistance, alleging that trial counsel failed to fully brief him on plea offers from the government.[3]

## LEGAL BACKGROUND

"To prove constitutionally defective representation, the defendant must show (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *United States v. Cassell,* 530 F.3d 1009, 1011 (D.C.Cir. 2008) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see Knowles v. Mirzayance,* —— U.S. ——, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009) ("[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel[.]"). To prove deficient performance, the defendant must show "'that counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms.'" *Knowles,* 129 S.Ct. at 1420 (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052); *United States v. Gwyn,* 481 F.3d 849, 853 (D.C.Cir.2007) (same). "Judicial scrutiny of counsel's performance must be highly deferential," and "[a] fair assessment of attorney performance requires that every effort be made to eliminate distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strick-*

---

**3.** Valencia–Rios did not identify as an issue before the evidentiary hearing trial counsel's alleged failure to fully brief him on plea offers. Thus, after the government objected at the hearing to questioning regarding this issue, defense counsel was cautioned that he had "leeway to explore the general communications" between Valencia–Rios and his trial counsel, but "failure to talk about the plea agreement [was] not an issue raised." (Hr'g Tr. 68:4–7, Oct. 20, 2008.) After the evidentiary hearing, the parties were ordered to brief whether Valencia–Rios' claim that trial counsel failed to fully brief him on plea offers had been waived and, if this claim was not waived, to estimate the duration of any supplemental hearing to be held on this issue. Valencia–Rios, through counsel, responded that he was not requesting a supplemental hearing and, with the consent of the government, requested consideration of this issue based on the record developed at the evidentiary hearing. This tenth claim, then, will be addressed.

*land,* 466 U.S. at 689, 104 S.Ct. 2052. Therefore, " 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Knowles,* 129 S.Ct. at 1420 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052); *see United States v. Askew,* 88 F.3d 1065, 1070 (D.C.Cir.1996). " '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Knowles,* 129 S.Ct. at 1420 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). The burden is on the defendant to prove his attorney's conduct was "unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

The prejudice prong "requires the defendant to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cassell,* 530 F.3d at 1011 (quoting *United States v. Eli,* 379 F.3d 1016, 1019 (D.C.Cir.2004)) (internal quotations omitted); *see Knowles,* 129 S.Ct. at 1422. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," and a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693–94, 104 S.Ct. 2052. The court "must consider the totality of the evidence before the … jury." *Id.* at 695, 104 S.Ct. 2052.

During the course of representation, counsel owes to her client several duties, and a substantial breach of any of the duties owed amounts to deficient performance. *See United States v. DeCoster,* 487 F.2d 1197, 1203–04 (D.C.Cir.1973). Counsel's obligations include a duty to (1) confer with the client without delay to ascertain potential defenses; (2) promptly advise the client of his rights and to take all actions necessary to preserve them; and (3) conduct "appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Id.* In *Kimmelman,* the Supreme Court elaborated on the duty to investigate, stating that " '[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " 477 U.S. at 384, 106 S.Ct. 2574 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

Where there is a failure to investigate a witness or other evidence that may violate the deficient performance prong, the defendant must still show how counsel's failure to investigate prejudiced the outcome of his case before a court can conclude counsel's performance resulted in ineffective assistance of counsel. *United States v. Debango,* 780 F.2d 81, 85 (D.C.Cir.1986). Thus, for a claim based on counsel's failure to investigate to succeed, a defendant must make

"a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result." … Courts should insist that the defendant show to

the extent possible precisely what information would have been discovered through further investigation.

*Askew,* 88 F.3d at 1073 (quoting *Sullivan v. Fairman,* 819 F.2d 1382, 1392 (7th Cir. 1987)); *see Gwyn,* 481 F.3d at 855 ("[A] defendant may not merely allege that counsel failed to undertake an investigation."). For example, in *United States v. Moore,* 104 F.3d 377 (D.C.Cir.1997), the defendant argued that his counsel was ineffective because counsel failed to subpoena witnesses who allegedly would have established the defendant's innocence. *Id.* at 391. "In rejecting his claim, the court noted that the alleged testimony of witnesses not subpoenaed "was tangential at best" and the evidence supporting the defendant's guilt was so strong as to render any error by defense counsel harmless." *Id.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. FAILURE TO TRAVEL TO PANAMA AND FAILURE TO INVESTIGATE WITNESSES

Valencia–Rios claims that Amato failed to travel to Panama and failed to follow his instructions on how to investigate his case, including to interview key witnesses Jose Antonio Ortega, the defendant's wife Clemencia Otalvaro Morales, Johnny Webb, Mariana Ciceron Rivas, and a person identified only as Tomas.[4]

### A. *Findings of fact*

The defendant testified that he instructed his counsel to travel to Panama to find potential witnesses Ortega, Rivas, Morales, and Tomas as possible witnesses located in Panama. (Hr'g Tr. 124:13–15, Oct. 20, 2008.) He said that Ortega would have testified about meeting the defendant in Panama and about the defendant's "activities and the nature of his businesses." (*Id.* at 125:3–5.) He viewed Rivas as important because Rivas "had known [the defendant] for six or seven years," and had knowledge of the defendant's business in the "free trading zone in Cologne between Panama and Colombia." (*Id.* at 125:11–16.) The defendant testified that trial counsel told him she was going to go to Panama, and that trial counsel never explained why she decided not to call Ortega, Rivas, or Tomas as witnesses. (*Id.* at 127:9–12.)

The defendant also testified that he instructed trial counsel to investigate using Johnny Webb, who had been the defendant's cellmate while incarcerated in D.C. Jail, as a defense witness. (*Id.* at 152:10–14.) The defendant testified that he provided trial counsel with a letter from Webb that said Webb rejected inquiries from the government seeking his cooperation and that Webb wanted to be of assistance. (*Id.* at 130:4–131:10.) The defendant complained that trial counsel did not investigate Webb and did not inform him why she decided not to pursue Webb. (*See id.* at 131:1–4.)

There is no dispute that trial counsel did not travel to Panama. Trial counsel testified that she discussed with the defendant "a trip to Costa Rica and . . . the possibility of a trip to Panama" for his case. (*Id.* at 22:1–3.) Trial counsel did travel to Costa Rica with Heather Shaner, counsel for codefendant Mejia. Trial counsel recalled that the defendant provided her with the name of a potential witness located in Panama, whose identity she could not affirmatively recall, but whom she spoke with by telephone when she was in Costa

---

4. The defendant's challenge to trial counsel's failure to interview Rivas and Tomas was not explicitly raised in his motion, and is arguably waived.

Rica. (*Id.* at 23:4–18.) She further testified that while in Costa Rica, she decided not to go to Panama, and that she informed the defendant of her decision. (*Id.* at 22:8–15.)

With respect to investigating potential witnesses, trial counsel did not provide any testimony suggesting she attempted to find out any additional information about Rivas and Tomas beyond what Valencia–Rios told her. She did interview a potential witness, Johnny Morales–Cooper, in a Costa Rican prison. With respect to Webb, trial counsel conceded that she did not investigate Webb beyond "finding out that [he] was locked up and who was representing him[.]" (*Id.* at 120:24–25.) For the defendant's wife Morales, however, trial counsel testified that she had several conversations with Morales when she was in the District of Columbia. (*Id.* at 24:16–25.)

In addition, trial counsel testified that she made the strategic decision not to call witnesses who knew the defendant well enough to identify the defendant's voice because the government on cross-examination could have "destroyed him" by having these witnesses listen to the incriminating tape recordings and corroborate that it was the defendant speaking. (*Id.* at 53:23–54:14; 78:10–13.) She testified that she concluded that potential witnesses Webb, Rivas, Tomas, and Morales–Cooper should not have been called because they could all identify the defendant's voice. (*Id.* at 52:20–53:1; 54:15–17.) Trial counsel stated that she also concluded that Morales–Cooper would not have been a helpful witness because Morales–Cooper admitted that the defendant's tape recorded conversations were about drugs. (*Id.* at 52:19–53:7.) Moreover, as for Webb, trial counsel testified that she didn't believe Webb could have provided exculpatory testimony for the defendant because he

had not known the defendant during the time of the charged conspiracy. (*Id.* at 77:11–17.) As for Morales, trial counsel stated that she decided not to call Morales as a witness not only because she could identify the defendant's voice, but also because the defendant told her he did not want Morales involved and because Morales knew of the defendant's drug trafficking activity. (*Id.* at 52:20–53:10.)

The court finds that the defendant has established that trial counsel decided not to travel to Panama after he instructed his counsel to go there. Taking the testimony in the light most favorable to Valencia–Rios, at best, Amato's failure to travel to Panama resulted in missed opportunities to speak with potential witnesses Ortega, Webb, Rivas, and Tomas. In addition, trial counsel did not investigate Webb. Nonetheless, the court finds credible trial counsel's testimony that she adopted a strategy not to call witnesses at trial who would be able to identify the defendant's voice and finds that trial counsel's decisions about whether to investigate certain witnesses stemmed from this strategic decision. Because she concluded from what the defendant said that all of the Panamanian witnesses could have identified the defendant's voice, they would not have been called as trial witnesses. With respect to Morales, the court credits trial counsel's testimony that she had several conversations with the defendant's wife about the possibility of her testifying while Morales was in the District of Columbia and finds credible trial counsel's proffered reasons for deciding not to call Morales at trial.

### B. *Conclusions of law*

█ Here, important evidence against the defendant included incriminating tape recorded narcotics-related phone conversations purporting to bear the defendant's

voice. Using defense witnesses who on truthful cross-examination would have been able to identify the defendant's voice would have undermined the defense attack on the reliability of the government's witnesses' voice identifications. Trial counsel's decision not to pursue such witnesses was a reasonable strategic decision that was within the range of competent professional assistance. Moreover, because trial counsel's decisions not to pursue investigations of Ortega, Rivas, Tomas, or Webb were consistent with the reasonable strategy not to call witnesses at trial who could identify the defendant's voice, these decisions were also reasonable in the circumstances. The defendant has not carried his burden to show that trial counsel's failure to travel to Panama or to investigate witnesses Webb, Ortega, Rivas, or Tomas amounted to deficient performance under the circumstances of his case.

 Further, the defendant has neither shown with the level of precision required what the proffered testimony of any of the proposed witnesses would be, nor shown that it likely would have had an impact upon the outcome of his case given the totality of the evidence against him. The defendant has not shown that Ortega, Rivas, and Tomas had anything more than some general knowledge about some business activity by the defendant. The defendant did not demonstrate that general testimony about some business activity by the defendant could have successfully rebutted the government's incriminating evidence that he participated in a cocaine-smuggling conspiracy. Similarly, the defendant's cellmate, Webb, did not meet the defendant until after the defendant had been arrested. There is no showing that Webb had any first-hand knowledge of the defendant's activities during the period of the charged conspiracy. Thus, the defendant has not carried his burden to demonstrate

how trial counsel's failure to travel to Panama or to interview these witnesses prejudiced his case.

 With respect to the defendant's wife Morales, the defendant has not shown that trial counsel's performance was deficient. Trial counsel investigated the potential utility of Morales testifying during trial counsel's meetings with Morales in the District of Columbia. In addition, because Morales could identify the defendant's voice and knew of his drug trafficking activities, trial counsel's decision not to call Morales as a witness was an objectively reasonable decision. Further, because Morales' truthful testimony likely would have weighed against the defendant, the defendant has not shown that there was any prejudice resulting from trial counsel's decision not to call Morales as a witness. Accordingly, the defendant has not shown trial counsel's decisions regarding Morales to be either deficient or prejudicial.

## II. DEFENDANT'S WRITTEN CONFESSION

The defendant contends that he received ineffective assistance because trial counsel failed to give him and review with him a copy of the confession the government said he wrote.

### A. *Findings of fact*

Trial counsel testified that she recalled showing the statement to the defendant while he was in the D.C. Jail, although she could not remember on what precise date, during one of their first meetings before the hearing on the motion she filed to suppress the statement. (Hr'g Tr. at 30:11–24.) She recalled going through the statement "line by line" with the defendant. (*Id.* at 38:14–15.) She further testified that she would not have given him a copy to keep with him at the jail because it was her policy not to leave copies of docu-

ments with her clients in custody where other cellmates could gain access to them and then later testify on behalf of the government against her clients. (*Id.* at 31:21–32:8.) Trial counsel also testified that the defendant was present for the hearing on the motion to suppress at which the statement was introduced into evidence. (*Id.* at 29:4–31:16; 80:4–19.)

The defendant testified that he remembered seeing the statement in court, but he was never given a copy to keep and did not remember being able to review the statement until after trial. (*Id.* at 142: 10–17; 144:6–10.) The defendant also testified that if he had been given a copy of his statement to keep in his cell at the jail, he would have "stipulated on how [the] proceeding [in which he wrote his statement] took place, the promises that the DEA agents made to [him] in order for [him] to receive a benefit" for "cooperat[ing] with the investigation of [his] case." (*Id.* at 145:15–19.) He did admit writing the statement. (*Id.* at 144:4–5.)

It is undisputed that trial counsel did not provide the defendant with a copy of his statement for the defendant to keep in his possession. Although the defendant testified that he did not remember seeing the confession until after trial, given how early trial counsel received a copy of the confession and how important it was to the case, the court finds trial counsel's recollection that she reviewed the defendant's written statement with the defendant at one of their early meetings probable and credible. The court finds that the defendant had an opportunity to view the statement at the pretrial hearing on the defendant's motion to suppress the statement and at trial. The statement was introduced into evidence on both occasions. Although it is unclear exactly what action the defendant means he would have taken when he says he would have "stipulated"

had he been given a copy of the statement, the court does not credit the implication that some materially more beneficial course of action would have been followed. The defendant was well aware of the existence of the statement and its contents, as he expressly admitted writing it, and was present at the pretrial hearing and the trial when the government introduced the statement into evidence against him. The defendant offered no persuasive reason to support the notion that his having a copy to keep would have made any difference, or that not having a copy prejudiced him.

### B. *Conclusions of law*

The defendant has failed to show any deficient performance or prejudice with respect to trial counsel's consultation regarding his written confession. It is of no moment that trial counsel did not give him a copy of the alleged confession to keep with him at the jail because trial counsel's practice of not leaving copies of confessions with incarcerated clients was a sound and sensible policy. Even if trial counsel had not provided the defendant with sufficient access to his statement, the defendant has not carried his burden to show any prejudice resulting from trial counsel's failure to give him a copy of the statement to keep in his possession. Because the defendant does not dispute that he was the author of the statement or that trial counsel cross-examined Chavarria to try to show that the statement was obtained in coercive circumstances, the defendant has not shown that trial counsel should have defended against the government's use of the written statement any differently than she did.

### III. DEFENSE VERSION OF TAPE RECORDING TRANSCRIPTS

The defendant alleges that trial counsel failed to prepare for use at trial a defense

version of the transcripts of the tape recorded phone conversations, and that failure was deficient performance that prejudiced his case.

### A. *Findings of fact*

Trial counsel testified to a number of steps she took to assure defense input in the transcripts used at trial. She personally reviewed the English-version transcripts of the tape-recorded phone calls. She employed a translator, Martha Goldstein, to listen to all of the tape recordings and review the government's version of the transcripts for errors in ascertaining what Spanish word was said and errors in translating the Spanish to English. (Hr'g Tr. 39:9–41:19.) She presented the government with proposed changes to the transcripts prepared by the government and the government accepted the proposed changes without objection. (*Id.* at 90:2–19.) The defendant provided no evidence to dispute that his counsel had defense versions of transcript portions prepared and that the government incorporated all of defense counsel's proposed changes into the version of the transcripts used at trial. The court finds that trial counsel's recollection was credible, that there was a defense version of transcript portions prepared, and that they were fully incorporated into the transcripts employed by the government at trial.

### B. *Conclusions of law*

■ Because trial counsel did produce defense versions of the phone call transcripts that were employed at trial, the defendant has adduced no facts in support of this claim. Accordingly, the defendant has not carried his burden to show any malfeasance or error by trial counsel with respect to the transcripts of the recorded phone conversations displayed at trial.

## IV. EXPERT TESTIMONY ON HANDWRITING AND VOICE IDENTIFICATION

The defendant contends he received ineffective assistance of counsel because trial counsel did not present at trial expert testimony comparing the defendant's handwriting to the handwriting in the statement the government said he wrote in Fort Lauderdale, or expert testimony on voice identification to discredit the government's witnesses who identified the defendant's voice on the tape recorded phone conversations.

### A. *Findings of fact*

The defendant admits that he wrote the written statement in Fort Lauderdale that was introduced by the government against him. (Hr'g Tr. at 144:4–5.) Trial counsel testified that in light of the defendant's admitted authorship, she determined a handwriting expert would not have been helpful to the defense. (See id. at 78:24–79:19.) Trial counsel further testified that since she could not dispute that the defendant penned the statement, her trial strategy was to argue that the content of the statement was dictated by the DEA agents. (*Id.* at 39:6–8.) Trial counsel further testified that she retained Dr. Offshe, a purported expert in false confessions, to assess whether Dr. Offshe could testify on whether the defendant's statement was written voluntarily. (*Id.* at 35:8–36:16, 79:11–18.) However, Dr. Offshe concluded he would not be a helpful witness because he believed the defendant's written statements were true. (*Id.*) Accordingly, trial counsel determined that Dr. Offshe's testimony would not have aided the defense. The defendant did not rebut trial counsel's testimony regarding her consultation with Dr. Offshe.

With respect to trial counsel's alleged failure to present voice identification testimony, trial counsel testified that she listened to all the tape recordings of phone conversations along with both the defendant and Morales–Cooper. Both said that it was the defendant's voice on most of the tapes, except for one or two. (*Id.* at 84:13–85:2.) Given Valencia–Rios' own confirmation that it was his voice on the bulk of the tape recordings, there would have been little point in retaining a voice identification expert whose accurate opinion could only have incriminated the defendant.

Nevertheless, trial counsel still explored the possibility of using voice identification expert JoAnne Payne as a defense witness. Ordinarily, Payne records voice samples in person and by phone to use for comparisons to questioned recordings. Trial counsel considered instead having Payne not record samples, but rather listen to only one of the calls that was not the defendant's voice and one of the calls that was the defendant's voice. In an effort to create reasonable doubt about the government witnesses' identifications, she would have Payne testify that the voices on the calls were different. However, trial counsel ultimately concluded that any voice identification expert used in this manner likely "would have been destroyed on cross-examination" because the government could elicit that the expert broke from her usual analytical protocol, and that trial counsel gave her only limited information to use in forming her expert opinion. (*Id.* at 43:8–44:20.) Instead, trial counsel decided to attack on cross-examination the government's witnesses who identified the defendant's voice on the recordings by showing how little they knew the defendant and how little time that they actually spent meeting with him. (*See id.* at 45:14–18.) The defendant provided no evidence at the hearing to rebut that it was his voice on most of the tapes or that a voice identification analysis would not have produced an opinion favorable to the defense.

## B. *Conclusions of law*

■ The defendant has not carried his burden of showing either deficient performance or prejudice with respect to trial counsel's decisions concerning the use of expert testimony on handwriting and voice identification. Given that the defendant never denied writing the statement introduced against him or being the speaker on the bulk of the recordings, trial counsel's decision not to seek experts to analyze the statement and tapes was entirely reasonable under the circumstances and was not deficient performance. Trial counsel did explore using a voice identification expert and made a tactical decision not to call a voice identification expert witness after determining that traditional voice identification analysis would not result in favorable testimony and that any favorable expert voice identification testimony procured through nontraditional methods would likely be undermined by cross-examination.

■ Further, the defendant's claims that trial counsel was ineffective because she failed to secure certain experts fails because the defendant has provided no evidence suggesting there was a handwriting or voice identification expert available who would have provided testimony favorable to him. *See United States v. Smith,* 90 F.3d 591, 1996 WL 397489, at *2 (D.C.Cir.1996) (unpublished Table opinion) (finding that the appellant's ineffective assistance claim on the basis that counsel had not retained a drug expert could not succeed because there was "no evidence to suggest that another chemist would have found something other than [the] cocaine base" the defendant was charged with dis-

tributing). Accordingly, the defendant has not carried his burden of showing trial counsel's decisions regarding handwriting and voice identification experts were deficient or prejudicial in any way.

## V. DEFENDANT'S DIAGRAM

The defendant alleges that he received ineffective assistance of counsel because trial counsel did not introduce into evidence in support of the defendant's motion to suppress his written statement a diagram the defendant drew of the room in which his written statement was obtained.

### A. *Findings of fact*

The defendant provided trial counsel with a drawing that he made to illustrate the confined space in the Fort Lauderdale room in which he wrote the statement used against him by the government. The defendant's diagram was a drawing on a plain piece of paper purporting to show a person kneeling in front of a table, holding a pen and writing on something, with two other individuals in the background. The drawing was not drawn to any scale and trial counsel did not find it of significant help. (Hr'g Tr. at 92:14–17, 105:22–107:2.) Trial counsel said that the defendant was not going to testify, and she concluded that it would have been difficult to introduce the diagram into evidence without putting the defendant on the stand to authenticate the drawing since the agents could not be relied upon to say the diagram was a fair and accurate depiction. (*Id.* at 37:4–38:3.) Accordingly, she made the tactical decision not to use the diagram at the motions hearing or at trial and instead, to question Chavarria about the coercive conditions in the small room when the defendant wrote his statement. (*See* Hr'g Tr. at 38:4–7; 106:23–107:2.)

The available portion of the motions hearing transcript reveals that the circum-stances under which Valencia–Rios made his written statement were explored during Chavarria's testimony. Chavarria testified during direct examination that upon arrival in Fort Lauderdale, he took Valencia–Rios to a private room in the airport where Valencia–Rios made his statement in the presence of Chavarria and Sanchez. During cross-examination, trial counsel drew out additional facts about the circumstances under which Valencia–Rios made his statement, including that Valencia–Rios was separated from his co-defendant when he was taken to the room in which he wrote his statement, the size and temperature of the room, and that the room lacked windows.

Authenticating the diagram reliably likely would have required the defendant to testify, and the risk of subjecting the defendant to cross-examination by the government at the motions hearing or at trial outweighed any potential benefit that the diagram would provide. Further, the defendant has not shown that the diagram on its face best conveyed an image of a cramped, coercive environment. Accordingly, cross-examination of Chavarria about the allegedly cramped, coercive environment in which the defendant wrote his statement made the same point the defendant sought to make with his diagram and was likely a better litigation strategy to choose over displaying the defendant's diagram. To the extent that the diagram could have been used during cross-examination of Chavarria, given the facts drawn out by both parties during Chavarria's testimony regarding the environment in which Valencia–Rios wrote his statement, Valencia–Rios has not demonstrated that use of the diagram would have revealed additional material facts about his environment that would have altered the ruling on his suppression motion.

B. *Conclusions of law*

 The defendant has shown neither deficient performance nor prejudice regarding trial counsel's decision not to use at his suppression hearing his diagram of the room where he wrote his statement. The choice of how to present evidence falls within the realm of litigation strategy that is generally protected from challenge. *See Kimmelman*, 477 U.S. at 384, 106 S.Ct. 2574. In light of the great risk posed by having the defendant testify to authenticate his diagram and the minimal value of the diagram in communicating the coercive conditions of the room, trial counsel's decision not to introduce his diagram and instead to reveal the conditions under which he wrote his statement through cross-examination of Chavarria was a sound, well-reasoned decision within the range of competent assistance. Similarly, because the conditions of the room were actually revealed through cross-examination of Chavarria, the diagram would not have had an impact upon the outcome of the defendant's motion. Accordingly, the defendant has not shown trial counsel's decisions regarding his diagram to be deficient performance or prejudicial to his case.

## VI. PANAMANIAN ARREST DOCUMENTS

The defendant alleges that trial counsel provided ineffective assistance because she did not adequately investigate and challenge the defendant's arrest in Panama.

A. *Findings of fact*

The defendant testified that investigation of his arrest in Panama was important to him and that he asked trial counsel to bring him documents and evidence relating to his arrest. (Hr'g Tr. 150:9–151:10.) Trial counsel testified that she had her paralegal contact a lawyer in Panama, Carlos Herrera Moran, who was working for the defendant's wife, for assistance in obtaining information relating to the defendant's arrest. (*Id.* at 14:10–21:20.) Trial counsel also recalled making some phone calls to Panama, but did not specifically recall the dates of the phone calls or to whom she spoke. (*Id.*) She further testified that she wrote letters to the Colombian consulate asking them to investigate the defendant's Panamanian arrest. (*Id.* at 16:16–21:20.) Trial counsel also recalled conducting research into case law regarding the impact of a foreign arrest on a defendant's rights once he is taken into custody by the United States and concluded that the law was not in the defendant's favor. (*Id.* at 26:15–27:9.) The defendant does not dispute trial counsel's recollection of the efforts she did undertake to investigate his arrest and the court credits trial counsel's testimony. (*Id.* at 150:17–151:14.)

The defendant has provided no evidence as to the relevance of his Panamanian arrest.

B. *Conclusions of law*

 Because the defendant has not provided any evidence as to the relevance of his Panamanian arrest, the defendant has not carried his burden to demonstrate that trial counsel's investigation decisions regarding his arrest prejudiced his case in any way. Of note, on appeal, the defendant argued "that the district court lacked jurisdiction over [his] case because DEA agents took [him] into custody in Panama and transferred [him] to the United States without following the formal requirements of the extradition treaty between the two countries." *Mejia*, 448 F.3d at 442. The court of appeals rejected this argument, upholding the application of the rule from *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). *See id.* at 443, 7 S.Ct. 225. Under the rule in *Ker*,

the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction".... [D]ue process of law is satisfied when one present in court is convicted of crime after ... a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*United States v. Alvarez–Machain,* 504 U.S. 655, 661–62, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (quoting *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (citation and footnote omitted)). The court of appeals held that, under *Alvarez–Machain,* a court first asks whether the abduction of a defendant violates the extradition treaty between the United States and the country in which the defendant was abducted. *Mejia,* 448 F.3d at 442 (citing *Alvarez–Machain,* 504 U.S. at 662, 112 S.Ct. 2188). If the abduction does not violate the extradition treaty—for example, because abduction at issue is outside the scope of the treaty—then the rule in *Ker* applies, and a court has jurisdiction over a defendant procured from the foreign country. *Id.* The court of appeals then upheld the finding that the defendant's arrest was outside the scope of the treaty between the United States and Panama and that the trial court had jurisdiction under the rule in *Ker. Id.* at 443. Accordingly, to the extent that the defendant is alleging that trial counsel's investigation of the Panamanian arrest affected disproving the court's jurisdiction over his case, such an argument is foreclosed as a matter of law by the court of appeals' decision. Because the defendant has not advanced any alternative theories for the relevance of evidence relating to his Panamanian arrest that could have been ob-

tained but was not, the defendant has not carried his burden to show prejudice stemming from trial counsel's investigation of his Panamanian arrest.

## VII. MEJIA'S FAILURE TO IDENTIFY THE DEFENDANT'S PHOTOGRAPH

The defendant contends that trial counsel provided him ineffective assistance because she did not pursue and present evidence that Mejia failed to identify the defendant's photograph.

### A. *Findings of fact*

The defendant provided no evidence to support his claim that Mejia could not identify the defendant's photograph. Trial counsel testified that she could not recall Mejia's alleged nonidentification and the defendant did not testify on his own behalf as to this issue. (*See* Hr'g Tr. 58:19–24.) Further, trial counsel testified that she felt the government's evidence at trial did not suggest that Valencia–Rios and Mejia did know each other. (*See id.* at 109:7–9.)

### B. *Conclusions of law*

Because the defendant failed to provide any evidence in support of this claim, he has failed to carry his burden of showing either deficient performance or prejudice with respect to the trial counsel's decisions regarding Mejia's alleged nonidentification of Valencia–Rios' photograph. Further, given that neither the government nor Mejia disputed Valencia–Rios' contention that he did not know Mejia, the introduction at trial of evidence about Mejia's nonidentification, if it existed, would not likely have made any difference in the outcome of the defendant's case. Accordingly, the defendant has not carried his burden of proving that he received ineffective assistance of counsel with respect to Mejia's nonidentification of the defendant.

## VIII. BRIEFING ON PLEA OFFERS

Valencia–Rios contends trial counsel provided him ineffective assistance because she did not fully brief him on potential plea offers.

### A. *Findings of fact*

Trial counsel testified that she recalled several plea offers by the government before and during Valencia–Rios' trial, including oral offers and at least one written offer, seeking to have Valencia–Rios plead guilty and cooperate with the government. (*Id.* at 60:25–61:16.) Trial counsel recalled that she received at least one letter from the government, dated August 7, 2001, containing a plea offer. She testified that she had the letter translated into Spanish for Valencia–Rios. (*Id.* at 62:2–10.) Although she could not recall the specific date on which she discussed this letter with the defendant or the specific details of the conversation, trial counsel recalled that she did discuss the plea offer in the August 7, 2001 letter with the defendant and obtained his signature on the translated letter, reflecting that he had read the letter but was not interested in pleading guilty. (*Id.* at 61:4–8; 68:8–16.)

Valencia–Rios testified that the only discussion he had with counsel regarding potential plea offers occurred in connection with the government's August 7, 2001 letter. (*Id.* at 133:6–8.) He further testified that he signed the letter and said he would not accept responsibility because trial counsel did not present a scenario under the Sentencing Guidelines that "could have been favorable for [him] had [he] accepted the guilty plea." (*Id.* at 133:14–18; *see* 148:3–7.) The defendant did not testify or present any other evidence demonstrating that there was any plea offer from the government that he would have accepted had he received different advice from his counsel.

Both witnesses appear to agree that trial counsel did discuss the August 7, 2001 letter with the defendant. To the extent that trial counsel and Valencia–Rios' recollections of whether there were additional discussions regarding plea offers differ, for the reasons explained below, it is unnecessary to determine whose recollection is more accurate.

### B. *Conclusions of law*

 The defendant has not shown any prejudice stemming from trial counsel's allegedly deficient efforts to brief him on plea offers. As for the government's August 7, 2001 plea offer, Valencia–Rios' testimony revealed that he was informed of the terms of the offer and that he decided not to accept the offer because he was not satisfied with the offer's terms. Neither his testimony nor trial counsel's testimony suggested that Valencia–Rios' understanding of that offer was incorrect or insufficient. To the extent there may have been any other plea offers, Valencia–Rios presented no evidence demonstrating that there was a plea offer that he would have accepted had it been adequately explained to him by trial counsel. Nor does Valencia–Rios allege any alternative theory as to how trial counsel's alleged failure to fully brief him on plea offers would have altered the outcome of his case. Having failed to show that there was a plea offer that Valencia–Rios would have accepted from the government or to allege any alternative theory explaining how counsel's allegedly deficient consultation regarding plea offers could have prejudiced his case, Valencia–Rios has not established that trial counsel's efforts to inform him of plea offers, even if deficient in some manner, were prejudicial to his case. Thus, the defendant has not proven that he received ineffective assistance of counsel with re-

spect to trial counsel's efforts to brief him on plea offers.

## CONCLUSION AND ORDER

In light of the findings of fact and conclusions of law above, the defendant has not shown that he received ineffective assistance of counsel at trial. With this Memorandum Opinion, both of the two directives on remand from the court of appeals now have been fulfilled. *See Mejia,* 448 F.3d at 459. Thus, it is hereby

ORDERED that the Clerk transmit a copy of this Memorandum Opinion to the Clerk of the Court of Appeals.